**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**RICK NOWLIN,**
**o/b/o LINDA NOWLIN, Deceased,**

      **Plaintiff,**

**v.**                                                                    **Case No.: 3:19-cv-00173**

**ANDREW M. SAUL,**
**Commissioner of the**
**Social Security Administration,**

      **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Brief in Support of Judgment on the Pleadings and the Commissioner's Brief in Support of Defendant's Decision, requesting judgment in his favor. (ECF Nos. 15, 16).

For the following reasons, the undersigned **RECOMMENDS** that the Court **GRANT** Plaintiff's motion for judgment on the pleadings to the extent that it requests

remand of the Commissioner's decision pursuant to sentence four of 42 U.S.C. § 405(g);
**DENY** Defendant's request to affirm the decision of the Commissioner; **REVERSE** the
final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of
42 U.S.C. § 405(g) for further administrative proceedings consistent with this PF&R;
and **DISMISS** this case, **with prejudice**, and remove it from the docket of the Court.

## I.    <u>Procedural History</u>

In November 2015, Plaintiff Linda Joann Nowlin ("Claimant") filed applications
for DIB and SSI, alleging a disability onset date of October 1, 2015 due to acute
pancreatitis, hand arthritis, depression, anxiety, high blood pressure, thyroid
dysfunction, neck pain, and leg cramps. (Tr. at 212-21, 241). The Social Security
Administration ("SSA") denied Claimant's applications initially and upon
reconsideration. (Tr. at 20). Thus, Claimant requested an administrative hearing on her
applications for benefits. (Tr. at 53-54). However, Claimant died on January 5, 2018,
three weeks before the administrative hearing was scheduled to take place. (Tr. at 234).
Accordingly, Claimant's husband, Rick Nowlin ("Substitute Claimant") was substituted
as the party of interest. (Tr. at 201). An administrative hearing was held on January 29,
2018 before the Honorable Melinda Wells, Administrative Law Judge (the "ALJ"). (Tr.
at 32-52). By written decision dated April 17, 2018, the ALJ found that Claimant was not
disabled as defined by the Social Security Act. (Tr. at 17-31). The ALJ's decision became
the final decision of the Commissioner on January 29, 2019 when the Appeals Council
denied Claimant's request for review. (Tr. 1-8).

Claimant timely filed the present civil action seeking judicial review pursuant to
42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer
opposing Claimant's complaint and a Transcript of the Administrative Proceedings.

(ECF Nos. 8, 9). Claimant filed a Brief in Support of Judgment on the Pleadings, and the Commissioner filed a Brief in Support of Defendant's Decision. (ECF Nos. 15, 16). Consequently, the matter is fully briefed and ready for resolution.

## II.    **Claimant's Background**

Claimant was 56 years old on her alleged onset date and 59 years old when she died. (Tr. at 234). She completed the twelfth grade, communicated in English, and previously worked as a cook, kitchen helper, and delicatessen manager. (Tr. at 37-38, 49, 240, 242-43).

## III.    **Summary of ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary, and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1

3

to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment.

*Id.* §§ 404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents his or her findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the four functional areas of understanding, remembering, or applying information; (2) interacting with others; (3) maintaining concentration, persistence, or pace; and (4) adapting or managing oneself will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental functional capacity. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2020. (Tr. at 22, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since October 1, 2015, the alleged disability onset date. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant's hypertension was a severe impairment. (Tr. at 22-23, Finding No. 3). The ALJ considered Claimant's fecal incontinence, intermittent dysphagia, hypothyroidism, obesity, generalized osteoarthritis, and acute pancreatitis, but found that the impairments were non-severe. (Tr. at 23).

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 23, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except she could have occasionally climbed and crawled and frequently balanced, stooped, kneeled and crouched. She would have required to avoid more than occasional exposure to vibration, unprotected heights, and moving machinery. She would have required reasonable access to restroom facilities.

(Tr. at 23-25, Finding No. 5).

At the fourth step, with the assistance of a vocational expert, the ALJ determined that Claimant was able to perform her past relevant work as a cook, kitchen helper, and deli manager. (Tr. at 25-26, Finding No. 6). Therefore, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 26, Finding No. 7).

## IV.    Claimant's Challenge to the Commissioner's Decision

Substitute Claimant raises four discernable challenges to the ALJ's decision.

First, he argues that the ALJ did not mention or reference Claimant's depression and anxiety, including never determining whether the impairments were severe at step two of the sequential evaluation. (ECF No. 15 at 16). Second, he states that the ALJ "summarily ignored" the opinions of Claimant's treating and examining physicians, including: Jamie Stoner, A.P.R.N.; Leigh Levine, D.O.; Kip Beard, M.D.; Mary Chaney, M.A.; and Clifton Bolinger, M.D. (*Id.*). Third, Substitute Claimant argues that the ALJ failed to develop the evidence regarding Claimant's pancreatitis, osteoarthritis, thyroid problems, anxiety, depression, insomnia, neck pain, and hand arthritis. (ECF No. 15 at 15). Finally, Substitute Claimant asserts that the ALJ did not consider whether Claimant's combination of impairments met a listing at step three of the sequential evaluation. (*Id.* at 16-17).

In response to Substitute Claimant's challenge regarding Claimant's mental impairments, the Commissioner acknowledges that the ALJ did not discuss the consultative mental examination. (ECF No. 16 at 12). However, the Commissioner argues that any error by the ALJ concerning Claimant's anxiety and depression was harmless because the record did not demonstrate that Claimant was significantly limited by a mental impairment. (*Id.*). Regarding the assertion that the ALJ "summarily ignored" opinions from Claimant's treating and examining providers, the Commissioner argues that the evidence that Substitute Claimant cited was treatment notes, not medical opinions about Claimant's ability to work. (*Id.* at 10). Further, the Commissioner asserts that the ALJ adequately developed the record and considered Claimant's impairments in combination. (*Id.* at 10-13).

## V.   <u>Relevant Evidence</u>

The undersigned has reviewed all of the evidence before the Court. The following

evidence is most relevant to the issues in dispute.

### A. Treatment Records

From January 31, 2014 to February 2, 2014, Claimant was treated for acute pancreatitis at St. Mary's Medical Center. (Tr. at 363, 499). When she saw her primary care provider, Nurse Practitioner Stoner, later that year on October 22, 2014, Claimant did not have abdominal tenderness, and her musculoskeletal and neurological examinations were normal. (Tr. at 373). However, Claimant had a depressed mood, and her affect was sad, tearful, and showed worry. (*Id.*). Nurse Practitioner Stoner diagnosed Claimant with, *inter alia*, generalized osteoarthritis in multiple sites, persistent insomnia, and generalized anxiety disorder. (Tr. at 374). She prescribed Klonopin in addition to Claimant's current medications of meloxicam and Cymbalta. (Tr. at 372, 374). On October 31, 2014, Nurse Practitioner Stoner additionally prescribed Ambien for Claimant's insomnia and Tramadol for Claimant's pain in her foot and toes. (Tr. at 377-78). Nurse Practitioner Stoner later added Neurontin to Claimant's medication regimen on January 13, 2015, due to Claimant's diagnosed neuropathy. (Tr. at 382-83). Claimant had a depressed and anxious mood with congruent affect at that appointment, although her thought processes and content were unimpaired. (Tr. at 382).

On May 8, 2015, Claimant followed up with Nurse Practitioner Stoner regarding issues with her thyroid and other chronic conditions. (Tr. at 384). Claimant's mood was euthymic with normal affect, but Nurse Practitioner Stoner still assessed Claimant with persistent insomnia and generalized anxiety disorder. (Tr. at 385-86). Claimant was no longer taking Cymbalta or Klonopin, but she was taking Requip and Tramadol. (Tr. at 384).

On October 7, 2015, Claimant told Nurse Practitioner Stoner that she was

working at Golden Corral in the bakery four days per week and feeling stressed. (Tr. at 388). She was again prescribed Klonopin and was still taking Ambien for insomnia. (*Id.*). On December 15, 2015, Claimant told Nurse Practitioner Stoner that she lost her job and was feeling even more anxious. (Tr. at 441). Her thought processes and content were not impaired, but Claimant was diagnosed with persistent insomnia and generalized anxiety, among other conditions. (Tr. at 442).

On January 11, 2016, Nurse Practitioner Stoner recorded that Claimant's thyroid was diffusely enlarged, and Claimant had difficulty swallowing. (Tr. at 439). Claimant also complained of feeling sluggish, but she did not have any nausea or vomiting. (Tr. at 436). Claimant denied having any abdominal tenderness, and her musculoskeletal and neurological findings were normal. (Tr. at 438). Nurse Practitioner Stoner diagnosed Claimant with hypothyroidism, scheduled an ultrasound, and continued Claimant on medications, including Klonopin. (Tr. at 438-39). Claimant's ultrasound was taken on February 15, 2016. (Tr. at 481). It showed a five millimeter solid nodule on Claimant's right thyroid lobe that was likely benign. (*Id.*).

Claimant saw another Nurse Practitioner, Tammy Jones, on March 16, 2016. Claimant stated that she was feeling fine and was taking Klonopin, Requip, Ambien, Ultram, and Neurontin in addition to other medications. (Tr. at 433.). Claimant's diagnosed conditions remained, *inter alia*, generalized osteoarthritis in multiple sites, persistent insomnia, generalized anxiety disorder. (Tr. at 434-35). Claimant did not have any significant symptoms on her standardized depression screening at this visit. (Tr. at 435).

On April 6, 2016, Claimant presented as a new patient to family medicine physician, Clifton Bolinger, M.D. She expressed that her mood-related symptoms were

not controlled by medication. (Tr. at 535). Her hypothyroidism was stable, with no endocrine symptoms, and she did not have any abdominal tenderness, nausea, or vomiting. (Tr. at 536-38). Claimant's musculoskeletal, neurological, and psychiatric findings were normal. (Tr. at 537-38). Dr. Bolinger diagnosed Claimant with primary insomnia and anxiety disorder, not otherwise specified. (Tr. at 538). Claimant was taking Ambien, Klonopin, gabapentin, and Ultram, as well as other medications. (Tr. at 535). For Claimant's anxiety, Dr. Bolinger added Lexapro, buspirone, and amitriptyline, and he adjusted her dosage of Klonopin from three times to two times per day. (Tr. at 538).

At Claimant's next monthly visit with Dr. Bolinger on May 6, 2016, Claimant reported that her mood-related symptoms were still uncontrolled, and she was not sleeping. (Tr. at 541). Claimant expressed that Klonopin was not "helping much," and she was having panic attacks and felt anxious all of the time. (*Id.*). On examination, Claimant's mood was dysthymic, and she was very emotionally labile, but her affect was normal. (Tr. at 544). Dr. Bolinger diagnosed Claimant with depression and anxiety disorder, not otherwise specified. (*Id.*). He increased Claimant's dosage of buspirone and added propranolol for panic/anxiety. (*Id.*). Claimant's hypothyroidism remained stable. (*Id.*).

Two weeks later, on May 27, 2016, Claimant saw Dr. Bolinger for follow-up regarding her hypothyroidism and depression. (Tr. at 547). Claimant was seeing a therapist and continued to have panic attacks without any significant decrease in her anxiety, but she denied depression at this appointment. (Tr. at 547, 549). Her hypothyroidism was still stable. (Tr. at 547). Although Claimant's mood was euthymic

with a normal affect, her PHQ9 score was 11.[1] (Tr. at 550). Dr. Bolinger stated that Claimant's history of standardized screening showed mild to moderate symptoms of depression. (*Id*.). Dr. Bolinger doubled Claimant's dosage of propranolol because her anxiety was not controlled on her current medications. (Tr. at 547, 551). Claimant was also taking buspirone, Lexapro, and Ambien. (Tr. at 547).

On July 5, 2016, Dr. Bolinger again recorded that Claimant's mood-related symptoms were not controlled by her medications, which included Lexapro, trazadone, buspirone, and Ambien. (Tr. at 554). Claimant was seeing a counselor, and it was suggested that she see a psychiatrist. (*Id*.). Claimant reported anxiety, depression, and sleep disturbances. (Tr. at 556). Her mood was dysthymic with normal affect, and her PHQ9 score was 19. (Tr. at 557). Dr. Bolinger increased Claimant's dosage of Trazadone and additionally prescribed Cymbalta. (Tr. at 558).

On August 23, 2016, Claimant's mood symptoms remained uncontrolled. (Tr. at 559). Her mood was euthymic with normal affect, but her PHQ9 score was 24, which showed clinically significant symptoms of depression. (Tr. at 562). Dr. Bolinger doubled Claimant's dosage of Cymbalta and continued her on her other psychiatric medications. (Tr. at 562-63). On October 11, 2016, Claimant's mood symptoms were still uncontrolled, and Dr. Bolinger additionally prescribed Paxil. (Tr. at 564-69). Claimant's depression screening score was 22 at that visit. (Tr. at 670).

On December 20, 2016, Claimant again saw Dr. Bolinger. She had a euthymic mood with normal affect, but her PHQ9 score was 24. (Tr. at 575, 672). Claimant's

---

[1] "The PHQ-9 is a multipurpose instrument for screening, diagnosing, monitoring and measuring the severity of depression." http://www.cqaimh.org/pdf/tool_phq9.pdf. Scores of 5-9 indicate minimal symptoms, 10-14 indicates minor depression, 15-19 indicates moderately severe major depression, and scores 20 or greater indicate severe major depression. *Id*.

depression was still listed as uncontrolled, and Dr. Bolinger doubled her dosage of Paxil and continued her on other medications. (Tr. at 575-76). Claimant's hypothyroidism remained clinically stable on medications without endocrine symptoms. (Tr. at 576).

On February 2, 2017, Claimant again had a euthymic mood and normal affect, but her PHQ9 score was 23 and her depression symptoms continued to be uncontrolled. (Tr. at 583-84, 673). Dr. Bolinger again adjusted her medications and suggested adding Seroquel or Abilify. (Tr. at 584). On April 21, 2017, Claimant's mood was dysthymic with normal affect and a PHQ9 score of 2. (Tr. at 592-93). However, her depression was still not controlled; thus, Dr. Bolinger added Abilify to Claimant's medication regimen. (Tr. at 593).

On May 26, 2017, Dr. Bolinger noted that Claimant's mood symptoms were improved with current medications, but there was still room for improvement. (Tr. at 596). Claimant had a euthymic mood with normal affect, but a PHQ9 score of 24. (Tr. at 599, 679). Dr. Bolinger additionally prescribed buspirone and Cymbalta. (Tr. at 599). The following month, Claimant again had a euthymic mood with normal affect, but her PHQ9 score was 21. (Tr. at 605, 681). Claimant's depression was still not controlled, and Dr. Bolinger doubled Claimant's dosage of Cymbalta, additionally prescribed Lyrica, and renewed Claimant's prescription for Ambien. (Tr. at 606).

On September 13, 2017, Dr. Bolinger noted that Claimant's anxiety and depression were finally well controlled on medications. (Tr. at 616). Claimant had a euthymic mood, normal affect, and PHQ9 score of 7. (Tr. at 615-16). She was continued on her current therapy that included Cymbalta, Paxil, and Ambien. (Tr. at 613, 616). However, on December 14, 2017, Claimant told Dr. Bolinger that, although her medications were helping, she was becoming more depressed. (Tr. at 618). Claimant had

a euthymic mood with normal affect, but her PHQ9 score was 21. (Tr. at 621, 695). Dr. Bolinger added Abilify, noting that Claimant's depression was not controlled on her current treatment plan. (Tr. at 621).

On January 5, 2018, Claimant died from a myocardial infarction (heart attack) due to hypertension and obesity. (Tr. at 234). Her death certificate listed that other conditions that contributed to her death, but did not result in the underlying cause, were hypothyroidism and depression. (*Id.*).

### B. Opinion Evidence

On January 19, 2016, Claimant underwent a clinical interview and mental status examination performed by licensed psychologist, Mary Chaney. Claimant's mental status examination did not reveal any abnormalities other than her depressed mood, restricted affect, and mildly impaired concentration. (Tr. at 411). Ms. Chaney diagnosed Claimant with mild depressive disorder based on Claimant's reported symptoms and history. (*Id.*).

On January 27, 2016, Claimant underwent an internal medicine examination performed by Kip Beard, M.D. (Tr. at 415). Regarding pancreatitis, Claimant stated that she was hospitalized for approximately three days one year earlier and continued to have lower abdominal pain that radiated through her back "maybe a couple of times per month" with associated nausea and vomiting. (*Id.*). She also complained of intermittent dysphagia, joint pain, and neck pain "every once in a while." (Tr. at 416). On examination, Claimant had some mild generalized abdominal tenderness, evidence of osteoarthritis, mild motion loss with discomfort in her spine, but she did not have any neurological compromise. (Tr. at 419).

On January 30, 2016, Jeff Harlow, Ph.D., performed a psychiatric review

13

technique (PRT) based upon a review of Claimant's records. Dr. Harlow assessed that Claimant had an affective disorder, but that it was a non-severe impairment because it did not affect her key functional capacities, which were within normal limits in her consultative examination. (Tr. at 77). Dr. Harlow found that Claimant had mild limitations in performing activities of daily living; maintaining social functioning; and maintaining concentration, persistence, or pace; and she had no episodes of decompensation of extended duration. (Tr. at 76). Dr. Harlow stated that he found Claimant's statements about her functional activities to be only partially credible because they were incongruent with the results in her consultative evaluation. (Tr. at 78). James Binder, M.D., affirmed these findings on April 30, 2016. (Tr. at 90-92).

On February 10, 2016, Rabah Boukhemis, M.D., assessed Claimant's physical RFC based upon a review of her records. Dr. Boukhemis found that Claimant could perform work at the medium exertional level with occasional climbing and crawling, frequent postural activities otherwise, and no concentrated exposure to extreme cold, vibration, and hazards. (Tr. at 66-67, 78-79). On reconsideration, Caroline Williams, M.D., found that Claimant did not have any severe impairments and did not have any exertional or non-exertional limitations. (Tr. at 90, 93, 101, 104).

### C. Claimant's Statements

Substitute Claimant testified in place of Claimant at the administrative hearing on January 29, 2018, following Claimant's death earlier that month. He stated that Claimant's depression medications "kind of made her feel better," but she remained depressed. (Tr. at 41). Substitute Claimant stated that Claimant's mental symptoms included crying for "no reason at all;" acting spaced out/confused; constant fatigue; loss of interest in everything, even eating; and trouble with her concentration and memory.

(Tr. at 41-42, 47). Substitute Claimant related that he would ask Claimant if she was "all right" and she would "just look at" him and finally say that she was "ok." (*Id.*). He further testified that Claimant could not watch a 30-minute television program without "drift[ing] off somewhere," and she stayed "pretty much to herself" and slept "all the time" during the day. (Tr. at 43). Substitute Claimant explained that he did "most everything for [Claimant]," including all major house cleaning, cooking, grocery shopping, and even shopping for her clothes. (Tr. at 43). Substitute Claimant stated that Claimant did not participate in any recreational activities. (Tr. at 48)

## VI.    Scope of Review

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to ensuring that the ALJ followed applicable Regulations and Rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial

evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.  <u>Discussion</u>

### A. *Mental Impairments*

Substitute Claimant challenges the Commissioner's decision on the basis that the ALJ did not discuss Claimant's depression and anxiety, including never determining whether the impairments were severe at step two of the sequential evaluation. (ECF No. 15 at 16). "Mental impairments require a distinct analysis under Social Security regulations." *Gunnoe v. Colvin*, No. 2:15-CV-12145, 2016 WL 5346956, at *3 (S.D.W. Va. Sept. 23, 2016). When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents the findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the four functional areas of understanding, remembering, or applying information; (2) interacting with others; (3) maintaining concentration, persistence, or pace; and (4) adapting or managing oneself will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work

activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental functional capacity. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3).

The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4). Regardless of whether the mental impairments are determined to be severe or non-severe at step two, they must be considered in the ALJ's determination of the claimant's RFC. *Gunnoe*, 2016 WL 5346956, at *3.

In order to trigger the special technique, a claimant must present a colorable claim of mental impairment. *Gunnoe,* 2016 WL 5346956, at *3 (citing *Sesberry v. Astrue,* No. 3:08-cv-989-J-TEM, 2010 WL 653890, at *3 (M.D. Fla. Feb. 18, 2010)). "A colorable claim has been defined as one 'which is not wholly insubstantial, immaterial, or frivolous.'" *Huffman v. Colvin*, No. 1:10CV537, 2013 WL 4431964, at *7 n.15 (M.D.N.C. Aug. 14, 2013) (quoting *Dykstra v. Barnhart,* 94 Fed. App'x 449, 450 (9th Cir. 2004)). The claimant satisfies his burden to demonstrate a colorable claim by

producing "medically acceptable clinical and laboratory diagnostic techniques" showing a psychological abnormality. *Sesberry,* 2010 WL 653890, at *4 (quoting 20 C.F.R. § 404.1508). "Furthermore, the impairment 'must be established by medical evidence consisting of signs, symptoms and laboratory findings, not only by [the claimant's] statement of symptoms.'" *Id.*

In this case, Claimant applied for disability benefits, in part, due to depression and anxiety. (Tr. at 241). Her primary care providers treated her for anxiety and depression throughout the entire relevant period with various combinations of Klonopin, buspirone, Lexapro, Trazadone, Cymbalta, Paxil, and Abilify. (Tr. at 388, 433, 439, 535, 541, 544, 547, 551, 554, 558, 562-63, 568-69, 584, 593, 599, 606, 613, 616, 621). Dr. Bolinger, in particular, repeatedly noted that Claimant's mood-related symptoms were uncontrolled, and he added new medications, increased her dosages, and adjusted her medications on numerous occasions. (Tr. at 535, 538, 541, 544, 547, 550, 551, 554, 558, 559, 562-63, 575-76, 583-84, 606, 621). Ms. Chaney, the examining psychologist, assessed in Claimant's consultative examination in January 2016 that Claimant had mild functional limitations resulting from depressive disorder. (Tr. at 411). The non-examining state psychologists likewise found that Claimant had medically determinable mental impairments, but concluded they were non-severe as they produced only mild functional limitations. (Tr. at 76-78, 90-92).

Despite the above evidence, the ALJ did not apply the special technique to evaluate Claimant's mental impairments. (Tr. at 22-26). Although Claimant indisputably presented colorable evidence of depression and anxiety, the ALJ never addressed Claimant's mental impairments in the written decision. *See, e.g., Greasamar v. Berryhill*, No. 1:16-CV-00389-RJC, 2018 WL 325243, at *4 (W.D.N.C. Jan. 8, 2018)

18

(finding that the claimant presented colorable claims of mental impairments where the claimant alleged anxiety and depression, the medical record showed some evidence of mental impairments, and a state agency assigned mild mental functional limitations). Furthermore, the Commissioner does not offer any argument to dispute that Claimant presented colorable claims of mental impairments. (ECF No. 16). Rather, the Commissioner contends that any error that the ALJ made regarding Claimant's anxiety and depression was harmless, because the record did not demonstrate that Claimant was significantly limited by her mental impairments. (*Id*. at 12).

The Commissioner's invitation for the Court to independently review the record to construct *post hoc* support for the ALJ's decision directly contravenes clearly-established, controlling federal law in this circuit. In a recently published case, the Fourth Circuit explained that "the weight of authority suggests that failure to properly document application of the special technique will rarely, if ever, be harmless because such a failure prevents, or at least substantially hinders, judicial review." *Patterson v. Comm'r of Soc. Sec. Admin*., 846 F.3d 656, 662 (4th Cir. 2017). The Court stated in continuation that "[a]dministrative determinations are required to be made in accordance with certain procedures which facilitate judicial review." *Id*. (quoting *Cook v. Heckler*, 783 F.2d 1168, 1172 (4th Cir. 1986)). Therefore, the Fourth Circuit held that it could not "fill in the blanks for the ALJ in the first instance" and the ALJ's failure to document application of the special-technique regulation constituted error that necessitated remand. *Id*. As to the Commissioner's argument that the omission of the special technique in the decision was harmless error, the Fourth Circuit indicated that it could not "affirm the ALJ's evaluation of Patterson's mental impairment because his decision did not explain how he weighed all relevant evidence: he did not rate

Patterson's four areas of functional limitation listed in [the regulation] according to the prescribed scale, nor did he explain how he reached his conclusions about the severity of the mental impairment." *Id.* The Fourth Circuit explained that, as it could not review the ALJ's mental impairment evaluation, it could not find that the ALJ properly assessed Patterson's RFC, and since the Court could not gauge the propriety of the ALJ's RFC assessment, it could not find that substantial evidence supported the ALJ's denial of benefits. *Id.*

Similarly, the record is not so one-sided in this matter that the Court can affirm the Commissioner's decision without improperly "fill[ing] in the blanks for the ALJ." *Patterson*, 846 F.3d at 662. As noted, Claimant alleged mental impairments in her disability applications and was treated for mental impairments throughout the relevant period. She had a mental consultative examination ordered by the agency, and the agency psychologists assessed that Claimant had mild functional limitations. While the ALJ very well could have considered the evidence and concluded that Claimant's mental impairments were not disabling, it is impossible to discern the ALJ's findings from the decision. The ALJ did not document her application of the special technique and only briefly mentioned Claimant's mental impairments in the course of reciting Substitute Claimant's hearing testimony, which included statements regarding Claimant's psychological symptoms. (Tr. at 22-26). The ALJ failed to document any analysis of the severity of Claimant's depression and anxiety, or any assessment of Claimant's mental functional abilities, and there is no evidence that the ALJ considered Claimant's mental limitations in determining her RFC.

Accordingly, in sum, the law is clear that when a claimant alleges a colorable mental impairment, the ALJ must apply the special technique to determine whether the

impairment is medically determinable, and, if it is, the ALJ must determine the severity of the impairment by making specific findings regarding the degree of limitation in specified functional areas. 20 C.F.R. §§ 404.1520a, 416.920a; *Patterson*, 846 F.3d at 662. The ALJ's conclusions must be written in the decision, and the failure to document the special technique is rarely, if ever, harmless. *Id.* Here, the ALJ failed to perform the special technique to evaluate Claimant's colorable mental impairments and, furthermore, failed to discuss the impact, if any, of Claimant's mental impairments on her ability to work. Therefore, because there is nothing in the decision upon which to base a review, the undersigned **FINDS** that the decision is not supported by substantial evidence and **RECOMMENDS** that the matter be remanded for application of the special technique and further review of Claimant's mental impairments. *Patterson*, 846 F.3d at 662 ("Harmonizing conflicting evidence and bolstering inconclusive findings requires credibility determinations that we cannot make; these exercises fall outside our scope of review.") (citing *Mascio v. Colvin*, 780 F.3d 632, 637-40 (4th Cir. 2015)); *Unsworth v. Berryhill*, No. 2:16-CV-00699, 2018 WL 773441, at *7 (E.D. Va. Jan. 16, 2018), *report and recommendation adopted,* 2018 WL 772087 (E.D. Va. Feb. 7, 2018) (recommending remand "for the ALJ to address the issue of Plaintiff's alleged mental impairments and provide an explanation of whether they qualified as severe," stating that "[e]ven if Plaintiff's alleged anxiety disorder was not a severe impairment, it still must be addressed in relation to its effect on Plaintiff's RFC as determined by the ALJ."); *Greasamar*, No. 1:16-CV-00389-RJC, 2018 WL 325243, at *4 (remanding the matter for application of the special technique).

### B. Medical Opinions

In his next challenge to the Commissioner's decision, Substitute Claimant states

that the ALJ "summarily ignored" the opinions of Claimant's treating and examining physicians. (ECF No. 15 at 16). When evaluating a claimant's application for benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. §§ 404.1527(b), 416.927(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* §§ 404.1527(a)(2), 416.927(a)(2).

The regulations outline how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits. In general, an ALJ should allocate more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *Id.* §§ 404.1527(c)(1), 416.927(c)(1). Even greater weight should be given to the opinion of a treating physician, because that physician is usually most able to provide a detailed, longitudinal picture of a claimant's alleged disability.[2] *Id.* §§ 404.1527(c)(2), 416.927(c)(2). Indeed, a treating physician's opinion should be given ***controlling*** weight when the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence. *Id.*

If the ALJ determines that a treating physician's opinion is not entitled to controlling weight, the ALJ must then analyze and weigh all the medical opinions of

---

[2] The special deference afforded to the opinion of a treating physician, often called the "treating physician rule," was eliminated for claims filed on or after March 27, 2017. 20 C.F.R. §§ 404.1520c, § 416.920c; *Rescission of Soc. Sec. Rulings 96-2p, 96-5p, & 06-3p*, 2017 WL 3928298 (S.S.A. Mar. 27, 2017). Claimant's applications were filed in 2015. Therefore, the undersigned applied the law in effect at that time.

record, taking into account certain factors listed in 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6),[3] and must explain the reasons for the weight given to the opinions. "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected ... In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *4. Nevertheless, in appropriate circumstances, a treating physician's opinion may be rejected in whole or in part in favor of a conflicting opinion by a non-treating source; for example, when the non-treating source's opinion is well-supported by evidence and explanation, is more consistent with the record as a whole, and is offered by a source with specialization in the subject matter of the opinion.[4] *See Brown v. Commissioner of Soc. Sec.,* 873 F.3d 251, 268 (4th Cir. 2017). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of

---

[3] The factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors bearing on the weight of the opinion. 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6).

[4] Although the regulations provide that in the absence of a controlling opinion by a treating physician, all of the medical opinions must be evaluated and weighed based upon various factors, the regulations do not explicitly require the ALJ to recount the details of that analysis in the written opinion. Instead, the regulations mandate only that the ALJ give "good reasons" in the decision for the weight ultimately allocated to medical source opinions. *Id.* § 404.1527(c)(2), 416.927(c)(2); *see also* SSR 96-2p, 1996 WL 374188, at *5 ("the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."). "[W]hile the ALJ also has a duty to 'consider' each of the ... factors listed above, that does not mean that the ALJ has a duty to discuss them when giving 'good reasons.' Stated differently, the regulations require the ALJ to consider the ... factors, but do not demand that the ALJ explicitly discuss each of the factors." *Hardy v. Colvin,* No. 2:13–cv–20749, 2014 WL 4929464, at *2 (S.D.W. Va. Sept. 30, 2014).

evidence. *Hays*, 907 F.2d at 1456.

Medical source statements on issues reserved to the Commissioner are treated differently than other medical source opinions. SSR 96-5p, 1996 WL 374183. In both the regulations and SSR 96-5p, the SSA explains that "some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability," including the following:

> 1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;
>
> 2. What an individual's RFC is;
>
> 3. Whether an individual's RFC prevents him or her from doing past relevant work;
>
> 4. How the vocational factors of age, education, and work experience apply; and
>
> 5. Whether an individual is "disabled" under the Act.

*Id.* at *2. "The regulations provide that the final responsibility for deciding issues such as these is reserved to the Commissioner." *Id.* Consequently, a medical source statement on an issue reserved to the Commissioner is never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." *Id.* at *2. Still, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.* at *3.

In the present action, Substitute Claimant states that Claimant's "examining and treating physicians have presented numerous medical records from treating and examining doctors supporting [Claimant's] claim for disability." (ECF No. 15 at 16). Substitute Claimant cites 283 pages of records in relation to this challenge, but does not identify any specific medical opinions that were ignored by the ALJ, other than to state that Dr. Bolinger opined that Claimant had severe depression and anxiety. (*Id*.). As discussed, the ALJ indeed overlooked the evidence concerning Claimant's mental impairments, including Claimant's treatment notes from Dr. Bolinger and other physicians, Claimant's mental consultative examination, and the opinion evidence from the state agency psychologists. On remand, such evidence must be considered insofar as it bears on the ALJ's application of the special technique and consideration of Claimant's mental functional limitations. However, Claimant does not otherwise cite to any medical opinions that the ALJ failed to consider. The broad reference to nearly the entire medical record does not assert any specific challenge to the ALJ's consideration of the evidence. *See, e.g., Williams v. Saul*, No. 3:18-CV-01282, 2019 WL 3756392, at *13 (S.D.W. Va. July 17, 2019), *report and recommendation adopted*, 2019 WL 3759805 (S.D.W. Va. Aug. 7, 2019) ("Claimant does not identify any error in the ALJ's consideration of the medical opinions, and her generalization that the ALJ failed to consider the opinions, without any reference to any specific error by the ALJ, fails to carry any weight."). The ALJ explicitly considered Claimant's internal medicine examination and treatment records, and, with the exception of the mental health evidence, the undersigned does not find any opinions or critical evidence that the ALJ "summarily ignored," as Substitute Claimant states. (Tr. at 22-25). Therefore, the undersigned **FINDS** that the ALJ's consideration of the evidence relating to Claimant's *physical* impairments is supported

by substantial evidence, although the evidence regarding Claimant's mental impairments will require review on remand.

### C. Duty to develop the Evidence

Substitute Claimant also broadly argues that the ALJ failed to develop the evidence regarding Claimant's pancreatitis, osteoarthritis, thyroid problems, anxiety, depression, insomnia, neck pain, and hand arthritis. (ECF No. 15 at 15). Again, Substitute Claimant articulates a legal standard related to this challenge, but he fails to provide a factual basis showing the applicability of that standard to the present case. Claimant does not identify any inadequacies or gaps in the record that the ALJ should have developed. The ALJ's duty was to ensure that the record contained sufficient evidence upon which she could make an informed decision. *Ingram v. Commissioner of Social Security Administration,* 496 F.3d 1253, 1269 (11th Cir. 2007); *see also Weise v. Astrue,* No. 1:08-cv-00271, 2009 WL 3248086 (S.D.W. Va. Sept. 30, 2009). Consequently, when examining the record to determine if it was adequate to support a reasoned administrative decision, the court looks for evidentiary gaps that resulted in "unfairness or clear prejudice" to Claimant. *Marsh v. Harris,* 632 F.2d 296, 300 (4th Cir. 1980).

In this case, the Transcript of the Administrative Proceedings contained the records of Claimant's clinical treatment; independent physical and mental medicine examinations; medical opinions; as well as Claimant's adult function reports and Substitute Claimant's testimony during the administrative hearing. It is unclear what further information Substitute Claimant contends the ALJ should have developed. The undersigned **FINDS** that the record was sufficient for the ALJ to make an informed decision and that there were not inadequacies or evidentiary gaps in the record for which

the ALJ was obligated to develop the evidence.

### D. Combination of Impairments

Finally, Substitute Claimant asserts that the ALJ did not consider whether Claimant's combination of impairments met a listing. (ECF No. 15 at 16-17). A claimant should be found disabled at the third step of the sequential evaluation process when his or her impairments meet or medically equal an impairment included in the Listing. The Listing describes for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity. *See* 20 C.F.R. §§ 404.1525, 416.925. The Listing is intended to identify those individuals whose mental or physical impairments are so severe that they would likely be found disabled regardless of their vocational background; consequently, the criteria defining the listed impairments is set at a higher level of severity than that required to meet the statutory definition of disability. *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990). Because disability is presumed with a listed impairment, "[f]or a claimant to show that his impairment matches a [listed impairment], it must meet all of the specified medical criteria." *Id.* at 530. If the claimant is unable to demonstrate that his impairments, alone or in combination, match the criteria of a particular listed impairment, the claimant may still establish disability by showing that his impairments are medically equivalent to the listed impairment.

To establish medical equivalency, a claimant must present evidence that his impairment, unlisted impairment, or combination of impairments, is equal in severity and duration to all of the criteria of a specific listed impairment. *Id.* at 530; *see also* 20 C.F.R. §§ 404.1526, 416.926. In Title 20 C.F.R. §§ 404.1526, 416.926, the SSA sets out three ways in which medical equivalency can be determined. First, if the claimant has

an impairment that is described in the Listing, but (1) does not exhibit all of the findings specified in the listing, or (2) exhibits all of the findings, but does not meet the severity level outlined for each and every finding, equivalency can be established if the claimant has other findings related to the impairment that are at least of equal medical significance to the required criteria. *Id.* §§ 404.1526(b)(1), 416.926(b)(1). Second, if the claimant's impairment is not described in the Listing, equivalency can be established by showing that the findings related to the claimant's impairment are at least of equal medical significance to those of a closely analogous listed impairment. *Id.* §§ 404.1526(b)(2), 416.926(b)(2). Finally, if the claimant has a combination of impairments, no one of which meets a listing, equivalency can be proven by comparing the claimant's findings to the most closely analogous listings; if the findings are of at least equal medical significance to the criteria contained in any one of the listings, then the combination of impairments will be considered equivalent to the most similar listing. *Id.* §§ 404.1526(b)(3), 416.926(b)(3). "For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment … A claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Sullivan,* 493 U.S. at 531. The claimant bears the burden of production and proof at this step of the disability determination process. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

In this case, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of a listed

impairment. (Tr. at 23). Substitute Claimant concludes, without documented support or specifics that "[e]ven a cursory review of the evidence of record would conclude that the totality of the claimant's medical and mental problems, when combined, can totally disable her and meet or exceed the combination of impairments listing provided by the Social Security Regulations for disability." (ECF No. 15 at 17). Such a conclusory allegation, without more, fails to state a valid challenge to the Commissioner's decision. Accordingly, the undersigned **FINDS** that the ALJ's step three decision is supported by substantial evidence.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **GRANT** Plaintiff's request for judgment on the pleadings, (ECF No. 15), to the extent that it requests remand of the Commissioner's decision; **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 16); **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this PF&R; and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to

file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Judge and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** October 22, 2019

Cheryl A. Eifert
United States Magistrate Judge

30